# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:        2021AP1187

Complete Title of Case:

**KOHLER CO.,**

**PETITIONER-APPELLANT,**

**V.**

**WISCONSIN DEPARTMENT OF NATURAL RESOURCES,**

**RESPONDENT-RESPONDENT,**

**CLAUDIA BRICKS AND FRIENDS OF THE BLACK RIVER FOREST,**

**INTERVENORS-RESPONDENTS.**

| | |
|---|---|
| Opinion Filed: | December 5, 2023 |
| Submitted on Briefs: | March 15, 2022 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Gill, JJ. |
| Concurred: | |
| Dissented: | |

Appellant
ATTORNEYS:        On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Deborah C. Tomczyk*, *Jessica Hutson Polakowski* and *Monica A. Mark* of *Reinhart Boerner Van Deuren s.c.*, Madison.

Respondent
ATTORNEYS:        On behalf of the respondent-respondent, the cause was submitted on the brief of *Joshua L. Kaul*, attorney general, and *Gabe Johnson-Karp*, assistant attorney general.

On behalf of the intervenors-respondents, the cause was submitted on the brief of *Christa O. Westerberg* and *Leslie A. Freehill of Pines Bach LLP*, Madison.

COURT OF APPEALS
DECISION
DATED AND FILED

December 5, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1187**

STATE OF WISCONSIN

Cir. Ct. No. **2019CV199**

IN COURT OF APPEALS

---

KOHLER CO.,

    PETITIONER-APPELLANT,

V.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,

    RESPONDENT-RESPONDENT,

CLAUDIA BRICKS AND FRIENDS OF THE BLACK RIVER FOREST,

    INTERVENORS-RESPONDENTS.

---

APPEAL from an order of the circuit court for Sheboygan County: L. EDWARD STENGEL, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

¶1 GILL, J. In anticipation of building a new golf course, Kohler Company sought approval from the Department of Natural Resources (DNR) for a

"wetland individual permit" to discharge dredged material or fill material into 3.69 acres of wetlands. Following a lengthy process, the DNR granted Kohler's permit request. Claudia Bricks and Friends of the Black River Forest (collectively, the FBRF) then filed a petition for a contested case hearing, which the DNR granted. Following the hearing, an administrative law judge (ALJ) issued a decision and order reversing the DNR's issuance of the permit, finding, among other things, that the DNR did not have enough information at the time it issued the permit to adequately analyze the "significant adverse impact[s]" to wetland functional values (WFVs), water quality, or "other significant adverse environmental consequences." *See* WIS. STAT. § 281.36(3n)(c)3. (2021-22).[1] Thereafter, the DNR adopted the ALJ's decision as its own final decision, and Kohler petitioned for judicial review. The circuit court affirmed the ALJ's decision.

¶2     On appeal, Kohler argues that the ALJ: (1) erred when he considered the entire proposed project when assessing the permit application, including wetlands and unregulated activities not related to the specific 3.69 acres of wetlands to be filled; (2) incorrectly found that the DNR did not have enough information at the time it issued the permit; (3) made findings that were unsupported by substantial evidence (namely, that the proposed project would cause cumulative impacts and that nutrients and pesticides would reach the groundwater and wetlands and would cause significant adverse impacts); (4) improperly reversed the DNR's decision instead of modifying the permit; and (5) erred when he required the DNR and Kohler to make "quantitative findings" with regard to secondary impacts.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted. WISCONSIN STAT. § 281.36 has been amended numerous times since Kohler's permit application process began in February 2017. *See* 2017 Wis. Act 21; 2017 Wis. Act 58; 2017 Wis. Act 59; 2017 Wis. Act 115; 2017 Wis. Act 118; 2017 Wis. Act 183; 2019 Wis. Act 59. None of the amendments are relevant to the issues on appeal.

¶3      We first conclude that WIS. STAT. § 281.36(3n)(b) and (c) require the DNR to consider the entirety of a "proposed project" when addressing a wetland individual permit, not just the wetlands within a proposed project.  By its plain meaning, § 281.36(3n)(c) instructs the DNR to determine whether a proposed project will result in "significant adverse impact[s]" to WFVs and water quality, and whether the proposed project will result in "other significant adverse environmental consequences."  As we will explain, this review necessarily requires the DNR to consider impacts beyond the physical footprint of directly impacted wetlands.  For example, the DNR must consider "[p]otential secondary impacts" to WFVs and the "net positive or negative environmental impact of the proposed project."  *See* § 281.36(3n)(b)3., 5.  This conclusion is affirmed by WIS. ADMIN. CODE § NR 103.03(1) (July 2015),[2] which defines WFVs to include the value of habitats for birds and "scenic beauty."

¶4      Second, we conclude that the ALJ's decision that the DNR did not have enough information at the time it issued the permit to adequately analyze the "significant adverse impact[s]" to WFVs, water quality, or "other significant adverse environmental consequences" is supported by substantial evidence.  Furthermore, the ALJ's decision did not "depend[]" on a finding that significant cumulative impacts to WFVs would occur if the project was approved and completed.  *See* WIS. STAT. § 227.57(6).  Specifically, the ALJ's ultimate conclusion that the DNR did not have the information necessary to make a WIS. STAT. § 281.36(3n)(c)3. determination did not depend on the finding that significant cumulative impacts to WFVs could result from the proposed project's construction.  Additionally, we conclude that there was substantial evidence to support the ALJ's

---

² All references to WIS. ADMIN. CODE ch. NR 103 are to the July 2015 register unless otherwise noted.

finding that the DNR lacked information to determine whether nutrients and pesticides would reach the groundwater and wetlands, and whether the nutrients and pesticides would cause significant adverse impacts.

¶5    We further conclude that the ALJ did not err by reversing the DNR's decision without first modifying the permit because Kohler never raised that issue with the ALJ and therefore forfeited any argument that the ALJ should have modified the permit. Lastly, we determine that the ALJ did not require the DNR or Kohler to make "quantitative findings" with regard to secondary impacts. We therefore affirm the circuit court's order affirming the ALJ's decision reversing the DNR's issuance of the wetland individual permit to Kohler.

## BACKGROUND

### I. The property

¶6    Kohler owns a 247-acre property in the City of Sheboygan.[3] The undeveloped property is bordered by Lake Michigan to the east, the Black River to the west, and the Kohler-Andrae State Park to the south, and it is currently zoned as suburban residential.

---

[3] The property was formerly in the Town of Wilson, but it was annexed to the City of Sheboygan in August 2017.

¶7    The property includes eighty-one wetlands totaling approximately forty-seven acres,[4] which the DNR categorized into four wetland types[5]: floodplain forest wetlands (44.167 acres), interdunal wetlands (0.4886 acres), ephemeral/relic ridge and swale wetlands (hereinafter, "relic ridge and swale wetlands") (0.104 acres), and Great Lakes ridge and swale wetlands (2.686 acres).

¶8    According to the wetland individual permit issued to Kohler, the interdunal wetlands and both types of ridge and swale wetlands on the property "are

---

[4] The ALJ stated in his decision that there are 44.91 acres of wetlands on the project site. As noted in the ALJ's decision, however, "[s]ome of the wetland assessment documents assess the wetlands on the entire project site, not just the Kohler property. Thus[,] the acreage numbers for the wetlands are not consistent throughout the record." For example, the DNR stated in the final Environmental Impact Statement (EIS) that "[t]here are 67 Great Lakes Ridge and Swale wetlands delineated on the site, totaling approximately 5.24 acres." However, the DNR's Wisconsin Wetland Rapid Assessment Methodology (WRAM) documents for the Great Lakes ridge and swale wetlands stated that there are 2.686 acres.

On appeal, neither the FBRF nor the DNR cite how many total acres of wetlands exist on the project site. Kohler, on the other hand, states in its brief-in-chief that there are 124.12 acres of wetlands on the project site. After searching the record, it appears that this number includes acreage belonging to the state park that is not part of the project site.

Based on our review of the record, including the initially issued permit, and because no party previously challenged the total acreage calculation in the DNR's WRAM documents, we will use the approximate forty-seven-acre figure and the subsequent individual calculations for each wetland found in the WRAM documents. Furthermore, because we use the figures from both Kohler's 247-acre property and the approximate acreage of land from the Kohler-Andrae State Park, we will refer to both collectively as "the property."

[5] Similar to the total acreage of wetlands on the property, the types of wetlands on the property have been characterized differently. For example, Dr. Quentin Carpenter—a senior lecturer (emeritus) at the University of Wisconsin-Madison and a witness for the FBRF—wrote in his prefiled testimony that there are three types of wetlands on the property: ridge and swale wetlands; interdunal wetlands; and forested seep wetlands. Likewise, Dr. John Jansen—a senior geophysicist and hydrogeologist at Collier Consulting and a witness for the FBRF—wrote in his prefiled testimony that the property contains: Great Lakes ridge and swale wetlands; Great Lakes interdunal wetlands; and a "wetland complex with alder thicket, southern sedge meadow, seepage slope and northern hardwood swamp." The final EIS identified the wetlands as Jansen identified them. Like the acreage discrepancies, we will rely on the DNR's wetland characterizations contained in the WRAM documents, as no party disputes these characterizations on appeal. We also note that most of the testimony at the contested hearing referred to the wetland types in the manner we have in the body of this opinion.

considered high to exceptional quality and globally rare." Similarly, the DNR found that the floodplain forest wetlands on the property are "high quality and rare in the region because of the loss of ash trees and increase of invasive species." In addition to the wetlands, the DNR stated that the property "is almost entirely forested with mature trees and has not been logged in over 150 years."

¶9 The property contains three separate aquifers: a shallow sand aquifer, a Silurian dolomite aquifer, and a deep Cambian-Ordovician aquifer. According to the final EIS, all of the wetlands on the site are "directly connected" to the shallow sand aquifer, which has "a depth to groundwater" level "of only a few feet." The Silurian dolomite aquifer is approximately 120 feet below the ground surface but it "is typically under artesian conditions with water levels well above the top of the aquifer and, in many instances, at or above the ground surface." The deep Cambian-Ordovician aquifer is approximately 750 to 950 feet below the ground surface.

¶10 According to the final EIS, all of the wetlands "are hydrologically connected to Lake Michigan." Furthermore, the interdunal wetlands and both types of ridge and swale wetlands "are dependent on groundwater for recharge and maintenance of water levels and water quality." Conversely, the floodplain forest wetlands "are dependent on both groundwater and surface water runoff to maintain water levels and determine water quality."

## II. The proposed project

¶11 Kohler proposes to construct and operate an 8,000-yard, eighteen-hole golf course on the property. Kohler's stated goal for this project is to build a world-class golf course that is rated in the top fifty golf courses in the world and has the potential to host major championship golf events.

¶12 All of the parties on appeal agree that the proposed project would completely fill 3.69 acres of wetlands, specifically: 0.1 acre of relic ridge and swale wetlands, 1.36 acres of Great Lakes ridge and swale wetlands, and 2.23 acres of forested floodplain wetlands. As part of the project, Kohler would clear approximately 100 to 120 acres of forested land cover in order to build, among other things, fairways, greens, and tees. Much of the disturbed area would be replaced with "turfgrass," specifically "Creeping Bentgrass," a type of grass commonly used on golf courses.

### III. Procedural history

¶13 As discussed in more detail below, Kohler applied for, and received, a wetland individual permit to fill the 3.69 acres of wetlands needed to construct the golf course. The FBRF subsequently filed a petition for administrative review, which the DNR granted. On review, the ALJ reversed the DNR's decision to grant Kohler the permit. Kohler petitioned for judicial review, and the circuit court affirmed the ALJ's decision to reverse the issuance of the permit. Kohler now appeals.

### DISCUSSION

¶14 "When an appeal is taken from a circuit court order reviewing an agency decision, we review the decision of the agency, not the circuit court." *Hilton ex rel. Pages Homeowners' Ass'n v. DNR*, 2006 WI 84, ¶15, 293 Wis. 2d 1, 717 N.W.2d 166. In this case, the DNR did not petition for judicial review of the ALJ's decision and therefore adopted the decision as its own pursuant to WIS. STAT. § 227.46(3)(a), and WIS. ADMIN. CODE § NR 2.155(1) (Feb. 2019).[6] *See also*

---

[6] All references to the WIS. ADMIN. CODE ch. NR 2 are to the February 2019 register unless otherwise noted.

7

*Hilton*, 293 Wis. 2d 1, ¶14; ***Meteor Timber, LLC v. DHA***, 2022 WI App 5, ¶20, 400 Wis. 2d 451, 969 N.W.2d 746 (2021), *review denied* (WI Apr. 13, 2022) (No. 2020AP1869). "Accordingly, we review the ALJ's decision as the [DNR's] final decision." *See* ***Meteor Timber***, 400 Wis. 2d 451, ¶20.

¶15    WISCONSIN STAT. § 227.57 establishes the procedure for judicial review of agency decisions. "Unless the court finds a ground for setting aside, modifying, remanding or ordering agency action or ancillary relief under a specified provision of this section, it shall affirm the agency's action." Sec. 227.57(2).

¶16    Our review of an agency's factual findings is limited. Under WIS. STAT. § 227.57(6),

> [i]f [an] agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

"Substantial evidence does not mean a preponderance of the evidence." ***Meteor Timber***, 400 Wis. 2d 451, ¶21 (citation omitted). Instead, "[a]n agency's findings are supported by substantial evidence if a reasonable person could arrive at the same conclusion as the agency." ***Clean Wis., Inc. v. PSC***, 2005 WI 93, ¶46, 282 Wis. 2d 250, 700 N.W.2d 768.

¶17    "If we conclude 'that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action,' we will 'set aside or modify the agency action' or 'remand the case to the agency for further action under a correct interpretation of the provision of law.'" ***Town of Ledgeview***

*v. Livestock Facility Siting Rev. Bd.*, 2022 WI App 58, ¶8, 405 Wis. 2d 269, 983 N.W.2d 685 (citing WIS. STAT. § 227.57(5)). "When reviewing questions of law decided by an agency, including statutory interpretation, our review is de novo."[7] *DOR v. Microsoft Corp.*, 2019 WI App 62, ¶13, 389 Wis. 2d 350, 936 N.W.2d 160 (citing *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶84, 382 Wis. 2d 496, 914 N.W.2d 21); § 227.57(11) ("Upon review of an agency action or decision, the court shall accord no deference to the agency's interpretation of law."). Pursuant to § 227.57(11), we accord no deference to an agency's interpretation of law. However, "due weight shall be accorded [to] the experience, technical competence, and specialized knowledge of the agency involved." Sec. 227.57(10); *see also Tetra Tech*, 382 Wis. 2d 496, ¶78 ("'Due weight' is a matter of persuasion, not deference.").

---

[7] "Until recently, we also deferred to administrative agencies' conclusions of law in many circumstances." *Wisconsin Prop. Tax Consultants, Inc. v. DOR*, 2022 WI 51, ¶8, 402 Wis. 2d 653, 976 N.W.2d 482. However, in *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, 382 Wis. 2d 496, 914 N.W.2d 21, our supreme court ended that practice, and the legislature has since codified the new approach under WIS. STAT. § 227.57(11). *Wisconsin Prop. Tax Consultants*, 402 Wis. 2d 653, ¶8.

## I. Wetland individual permit

### A. Wetland individual permit process

¶18 The DNR is required to issue a permit before an individual "may discharge dredged material or fill material into a wetland."[8] WIS. STAT.

---

[8] Kohler submitted supplemental authority pursuant to WIS. STAT. RULE 809.19(10), citing the recent United States Supreme Court decision in **Sackett v. EPA**, 598 U.S. 651 (2023). According to Kohler, "federal and state laws regulating wetlands are inextricably intertwined," Wisconsin "has been delegated authority to regulate 'waters of the United States,'" and "[b]oth the text of the underlying [wetland individual permit] and the final decision of the [ALJ] … confirm that such permit was granted, not just pursuant to Wisconsin [law], but also pursuant to the [Clean Water Act (CWA)]." We interpret Kohler's contention to be that **Sackett** dictates reversal of the ALJ's decision because the wetlands on Kohler's proposed golf course site are not subject to the CWA and, therefore, cannot be regulated as wetlands under Wisconsin law.

It is true that **Sackett** altered the analysis for defining a wetland subject to the CWA. **Sackett**, 598 U.S. at 678-79; *see also* 33 U.S.C. § 1362(7) (prohibiting the discharge of pollutants into "the waters of the United States"). Kohler's argument fails to acknowledge, however, that Wisconsin law is not limited to regulating "waters of the United States." *Cf. Sackett*, 598 U.S. 686 (Thomas, J., concurring) (federal authority "over certain navigable waters is granted and limited by the Commerce Clause").

In Wisconsin, the legislature delegated to the DNR "general supervision and control over the waters of the state." WIS. STAT. § 281.12(1). The "waters of the state" include wetlands. A "wetland" is "an area where water is at, near, or above the land surface long enough to be capable of supporting aquatic or hydrophytic vegetation and which has soils indicative of wet conditions." WIS. STAT. §§ 23.32(1), 281.01(21). Importantly, WIS. STAT. § 281.36(4n)(c) provides that a wetland individual permit does "not apply to any discharge into a *nonfederal wetland* that occurs outside an urban area and to which" certain requirements apply, including that "[t]he discharge does not affect a rare and high quality wetland." (Emphasis added.) A "nonfederal wetland" "means a wetland that is not subject to federal jurisdiction under 33 U.S.C. 1344." Sec. 281.36(1)(br); *Sackett*, 598 U.S. at 675 (explaining that § 1344 is part of the CWA). "A person who proposes a project that may affect a wetland [under one of the exceptions to a wetland individual permit] shall notify the [DNR] no fewer than 15 working days before initiating the project," and submit one of two things "to show that the wetland … is eligible for" exemption: (1) "[a] statement issued by a professional who has investigated the wetland and who is qualified to give such an opinion"; or (2) "[a] wetland delineation prepared by a qualified professional showing the exact location and boundaries of the wetland." Sec. 281.36(4n)(e)1.

§ 281.36(3b)(b). As relevant here, the DNR may issue a "wetland individual permit"[9] only once it determines that "[t]he proposed project will not result in significant adverse impact to [WFVs], in significant adverse impact to water quality, or in other significant adverse environmental consequences."[10] WIS. STAT. § 281.36(3n)(c)3. WFVs are identified as:

> (a) Storm and flood water storage and retention and the moderation of water level fluctuation extremes;
>
> (b) Hydrologic functions including the maintenance of dry season streamflow, the discharge of groundwater to a wetland, the recharge of groundwater from a wetland to another area and the flow of groundwater through a wetland;
>
> (c) Filtration or storage of sediments, nutrients or toxic substances that would otherwise adversely impact the quality of other waters of the state;
>
> (d) Shoreline protection against erosion through the dissipation of wave energy and water velocity and anchoring of sediments;
>
> (e) Habitat for aquatic organisms in the food web including, but not limited to fish, crustaceans, mollusks, insects, annelids, planktonic organisms and the plants and

---

Here, even assuming that the affected wetlands on Kohler's property are nonfederal under *Sackett*'s analysis of the CWA (meaning the wetlands meet the definition of nonfederal wetlands under WIS. STAT. § 281.36(1)(br)), the wetlands are not subject to any exemptions to a wetland individual permit. Kohler did not comply with the notification requirements in § 281.36(4n)(e)1., and, even so, Kohler would be unable to demonstrate that the proposed discharge on its property will "not affect a rare and high quality wetland." *See* § 281.36(4n)(c). As explained, it is undisputed that the wetlands on the property are "rare and high quality." Kohler was therefore still required to obtain a wetland individual permit, and *Sackett* is inapplicable to this case.

[9] The DNR may also issue "wetland general permits," which are not at issue in this appeal. *See* WIS. STAT. § 281.36(3g). As such, we will refer to a "wetland individual permit" as a "permit" throughout this opinion when appropriate.

[10] As we have done previously, we occasionally refer to the three considerations under WIS. STAT. § 281.36(3n)(c)3. collectively as "significant adverse environmental impacts." *See Meteor Timber, LLC v. DHA*, 2022 WI App 5, ¶31 n.6, 400 Wis. 2d 451, 969 N.W.2d 746 (2021), *review denied* (WI Apr. 13, 2022) (No. 2020AP1869).

animals upon which these aquatic organisms feed and depend upon for their needs in all life stages;

(f) Habitat for resident and transient wildlife species, including mammals, birds, reptiles and amphibians for breeding, resting, nesting, escape cover, travel corridors and food; and

(g) Recreational, cultural, educational, scientific and natural scenic beauty values and uses.

WIS. ADMIN CODE § NR 103.03(1)(a)-(g); *see also* ***Meteor Timber***, 400 Wis. 2d 451, ¶31 n.6. In evaluating the impacts to WFVs under § 281.36(3n)(c)3., the DNR shall consider:

1. The direct impacts of the proposed project to [WFVs].

2. The cumulative impacts attributable to the proposed project that may occur to [WFVs] based on past impacts or reasonably anticipated impacts caused by similar projects in the area affected by the project.

3. Potential secondary impacts of the proposed project to [WFVs].

4. The impact on functional values resulting from the mitigation that is required under [§ 281.36(3r)].

5. The net positive or negative environmental impact of the proposed project.

Sec. 281.36(3n)(b).

¶19 As relevant to this appeal, after the DNR issues a decision on an application for a wetland individual permit, "[a]ny interested person may file a petition with the [DNR] for administrative review." *See* WIS. STAT. § 281.36(3q)(b). If the DNR grants the petition for administrative review, it shall refer the matter to the division of hearings and appeals, and the hearing shall be treated as a contested case under WIS. STAT. ch. 227. Sec. 281.36(3q)(f)4., (g)1. When a party challenges the DNR's initial granting of a permit, it has the burden to

demonstrate by a preponderance of the evidence that the DNR erred in its decision. *See* § 281.36(3q)(g)5.; WIS. ADMIN. CODE § HA 1.17(2) (June 2023).

B. Kohler's wetland individual permit process

¶20 In 2014, Kohler began discussing the idea of developing a golf course on the property. Prior to the permit application process, Kohler submitted an Environmental Impact Report (EIR) to the DNR in April 2015, the DNR prepared a draft of the EIS, and the DNR conducted a public hearing on the draft in July 2016. In February 2017, the DNR and Kohler began the actual application process and held a pre-application meeting as required by WIS. STAT. § 281.36(3m)(a).

¶21 In March 2017, Kohler filed a permit application with the DNR pursuant to WIS. STAT. § 281.36. The DNR determined that the application was incomplete and requested additional information from Kohler, including a forest management plan, a vegetative buffer planting plan, a grading plan, an erosion control and stormwater management plan, a nutrient management plan, a pesticide management plan, and a water table map.

¶22 In January 2018, the DNR granted Kohler's application and issued a wetland individual permit.[11] In the permit, the DNR identified all WFVs associated with the project site:

---

[11] In addition to a wetland individual permit, the DNR stated in the final EIS that in order to get full approval for the project, Kohler will need to receive six other permits and/or approvals from the DNR relating to: shore protection, endangered and threatened species protection, stormwater discharge, high-capacity well permits, conversion of Land and Water Conservation Fund Act (LAWCON) lands, and potential tribal consultation.

a. Floristic integrity rated high to exceptional with the plant community integrity very high to exceptional with little to no existing stressors, rare plant community, and low level of invasive species present. The ridge and swale type of wetland is imperiled in the state because of its rarity. Native species generally dominate the swales with a low percent cover of invasive species present.…

b. Human use values rated as exceptional due to the current use of property for trails and potential elsewhere.

c. Wildlife habitat rated exceptional because of the unique habitat for rare species and large block of high quality, diverse wetland and contiguous habitat.

d. Groundwater processes rated as high due to it being dependent on local groundwater fluctuations; intact recharge and discharge functions which have positive impacts on local groundwater and surface water quality.

e. Fish and aquatic life habitat rated as high because it provides high value for amphibian use.

f. Water quali[t]y protection rated as low due to the isolated nature of the wetlands.

g. Shoreline protection is rated high in the forested floodplain wetland complex due to the dense vegetative cover along the banks of the Black River providing significant shoreline protection functions.

h. Flood and stormwater support and shoreline protection are rated as low in the ridge and swale complex due to [their] isolated nature, and provide[] limited flood and stormwater storage functions. Flood and stormwater storage are rated as medium in the floodplain forest

---

Outside of the DNR permitting process, the DNR stated in the final EIS that Kohler will need permits and/or approval from other state and federal governing bodies in order to build the proposed golf course, including from: the U.S. Army Corps of Engineers (relating to the CWA); the National Park Service (relating to LAWCON); the U.S. Fish and Wildlife Service (relating to the Federal Endangered Species Act and the Migratory Bird Treaty Act); the Federal Emergency Management Agency (relating to a conditional letter of map revision and letter of map revision); the Wisconsin State Historic Preservation Office (relating to an archaeologic consultation); Sheboygan County (relating to a shoreland-floodplain conditional use permit, sanitary permit, shoreland-wetland rezoning, erosion control permit, and county cutting notice); and the City of Sheboygan (relating to a conditional use permit, stormwater permit, erosion control permit, building permits, and architectural review board approval).

because this wetland type provides moderate flood and stormwater storage functions.

¶23    The DNR stated in the permit that 3.69 acres of wetlands would be permanently lost, along with any WFVs associated with those wetlands. Particularly, the DNR concluded that the ridge and swale wetlands and interdunal wetlands "are ranked as S1 to S2, which means the communities are considered imperiled in Wisconsin and globally due to a restricted range and few populations or occurrences. This loss is expected to be irreversible and has high significance."

¶24    In addition to WFVs associated with the 3.69 acres of wetlands that would be permanently lost, the DNR concluded that secondary impacts to WFVs "may affect 4.79 acres of wetland not covered by discharged material, and 0.03 acres of temporary wetland impact." Specifically, the DNR stated that possible secondary impacts to WFVs related to the 4.79 acres included "increased runoff of nutrients, herbicides, and pesticides, and foot and cart traffic in the remaining wetland complex"; "[p]ermanent alteration to wetland hydrology (change in grade and removal of trees); decrease in habitat from increased invasive species, nutrient loading, sediment deposition, potential disruption of wildlife use (breeding, nesting) and movement through operation of the golf course"; and "[d]ecrease in wooded cover converted to managed turf grass." According to the permit, increased foot and cart traffic, as well as runoff, would be "likely to provide a conduit for invasive species establishment." The DNR also noted that there could be secondary impacts to WFVs due to a "well that could draw down the water table."

¶25    Like the direct impacts to WFVs, the DNR recognized that the secondary impacts to WFVs were "expected to be permanent and irreversible and the significance of those impacts is high. Secondary impacts to [WFVs] are not expected to be entirely offset under the proposed project."

15

¶26  The DNR also considered cumulative impacts to WFVs, and it determined that "significant cumulative impacts" might occur.  Cumulative impacts included the fact that approving a wetland individual permit for "an exceptional quality ridge and swale complex, a globally rare community," could "lead to increased applications to fill rare, sensitive, and valuable wetland plant communities" as well as"[t]he potential for additional development of the site and further cutting of the wooded community."

¶27  The permit also contained thirty-eight conditions that Kohler was required to comply with during and after construction, including the following:

> 11. Construction shall be accomplished in such a manner as to minimize erosion and siltation into surface waters. Erosion control measures (such as silt fence and straw bales) must meet or exceed the technical standards of [WIS. ADMIN. CODE] ch. NR 151 [(July 2018)[12]].…
>
>   ….
>
> 13. All equipment used for the project including but not limited to tracked vehicles, barges, boats, hoses, sheet pile and pumps shall be de-contaminated for invasive and exotic viruses and species prior to use and after use.
>
>   ….
>
> 19. You shall conduct a post construction wetland boundary survey to document the wetland impacts.  You shall develop a wetland restoration plan for [DNR] review and approval for any wetland impacts outside of the authorized fill areas[.]  The wetland restoration plan shall include, but is not limited to, measurable performance standards and a maintenance and monitoring plan of no less than five years.
>
> 20. You shall hire Independent Environmental Monitors (IEMs) approved by the [DNR].  The scope of work for

---

[12] All references to the WIS. ADMIN. CODE ch. NR 151 are to the July 2018 register unless otherwise noted.

the IEMs will be developed jointly with [Kohler and the DNR].

….

22. Follow Best Management Practices [(BMPs)] for pest management and the Integrated Pest Management plan submitted to the [DNR] on October 27, 2017. Within 25 feet of surface water or wetland boundaries …[,] use pesticides approved for aquatic use by [federal agencies] and minimize drift. In areas with a shallow groundwater aquifer[,] use chemicals that have a shorter half-life or that will not persist in aquatic environments where practicable.…

23. The Nutrient Management Plan shall follow [WIS. ADMIN. CODE ch.] NR 151 and Technical Standard 1100 for application timing and as described in the Integrated Golf Course Management Plan [(IGCMP)] submitted to the [DNR] on October 27, 2017.…

….

25. Infiltration strips shall be installed and maintained according to the Stormwater Management Plan submitted with the application and dated December 7, 2016.

….

37. During any spectator events at the golf course, take practical measures to avoid impacts to remaining wetlands on the site.

C. The FBRF's petition for administrative review and the ALJ's decision

¶28    In response to the DNR granting Kohler's permit request, the FBRF filed a petition for administrative review under WIS. STAT. § 281.36(3q)(b) and requested a stay of discharge pending the administrative review.

¶29    Prior to the administrative hearing, the parties narrowed the issues that are relevant to this appeal to: (1) whether the permit satisfied the standard set forth in WIS. STAT. § 281.36(3n)(c)3.; and (2) whether the DNR had sufficient information to consider that standard.

17

¶30     Following the hearing and briefing from the parties, the ALJ reversed the DNR's decision to grant the permit.  The ALJ concluded that the FBRF "carried their burden of proof to show that the [DNR] did not have sufficient evidence to support its determination" under WIS. STAT. § 281.36(3n)(c)3.  That is, the DNR did not have sufficient evidence to support its finding that the "proposed project" would not result in significant adverse environmental impacts.  *See id.*  In reaching this conclusion, the ALJ defined the "proposed project" under § 281.36(3n)(c)3. as "the construction and operation of the proposed golf course."[13]

¶31     Regarding secondary impacts to WFVs, the ALJ found that "there [were] no conditions in the permit addressing the adverse impacts to wildlife and stopover habitat resulting from the construction activities."  Accordingly, the ALJ held that the DNR's "determination that the proposed project w[ould] not result in significant adverse impacts to [WFVs] cannot apply to the secondary impacts resulting from the tree clearing, grading, and soil conversion activities."

¶32     With regard to water quality, the ALJ found that "[i]t is undisputed that the introduction of nitrates, phosphorus, pesticides, oil, grease, and other contaminants into the groundwater and wetlands will adversely impact [WFVs] and the water quality" on the property.  According to the ALJ, the DNR did not consider whether operation of the course would affect "the levels of the chemicals and contaminants that [would] reach the groundwater and wetlands," nor did it consider

---

[13] The ALJ did not take issue with the DNR's determination regarding the direct impacts of Kohler's project to WFVs because the loss of the 3.69 acres of wetlands was to be properly mitigated "by the purchase of credits from the [DNR's] in-lieu fee program."  *See* WIS. STAT. § 281.36(3r).

the direction of the groundwater flow and the separation between the surface and groundwater.

¶33 Kohler commenced an action in the circuit court challenging the ALJ's decision to reverse the DNR's permit issuance.[14] *See* WIS. STAT. § 281.36(3q)(h)2. After briefing from the parties, the court denied Kohler's request to overturn the ALJ's decision and dismissed Kohler's lawsuit.[15]

## II. The ALJ did not err in considering the entire proposed project, including wetlands that were not proposed to be filled, under WIS. STAT. § 281.36(3n)(b) and (c).

¶34 Kohler first contends that the ALJ exceeded the scope of WIS. STAT. § 281.36 when he reversed the DNR's decision to issue a permit by considering "unregulated activities occurring outside the impacted wetlands." In support of this argument, Kohler argues that WIS. STAT. ch. 281's statutory scheme is solely concerned with water and that § 281.36 cannot be divorced from the chapter's statutory scheme. We construe Kohler's argument to be that the DNR does not have authority under § 281.36 to consider: (1) unregulated actions (such as tree clearing); or (2) other significant adverse environmental impacts to wetlands other

---

[14] Kohler attempted to present additional evidence during the circuit court proceedings, and the court denied its motion to do so. Kohler does not challenge that decision in this appeal, and the additional issue of whether this additional evidence should have been denied is therefore not before us.

[15] Because our review is limited to the ALJ's decision, we will not give a detailed summary of the circuit court's decision. Instead, we will rely on and cite the court's decision in our analysis when appropriate.

than the wetlands subject to discharge.[16]  Conversely, the FBRF contends that "to assess whether the [DNR] had sufficient information to determine whether the standards in … § 281.36(3n)(b)3. were satisfied, [the ALJ] was compelled to review the evidence and findings on the project's secondary impacts to [WFVs] as directed by" the statute.  The DNR echoes the FBRF's argument in this regard.  We agree with the FBRF and the DNR.

¶35     As previously noted, we independently review an ALJ's interpretation of statutes and administrative code provisions.  *See Microsoft Corp.*, 389 Wis. 2d 350, ¶13; *Milwaukee Acad. v. DCF*, 2018 WI App 13, ¶11, 380 Wis. 2d 227, 908 N.W.2d 189 (interpretation of administrative rules is "subject to principles of statutory construction" (citation omitted)).  We begin with the language of the statute and give that language "its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110.  "We interpret statutory language 'in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results.'" *Citation Partners, LLC v. DOR*, 2021 WI App 86, ¶16, 400 Wis. 2d 260, 968 N.W.2d 734 (citation omitted).

---

[16] We pause to address the scope of Kohler's arguments as to this issue on appeal because its arguments in this regard are not entirely clear.  In its reply brief, Kohler states that the FBRF and the DNR "mischaracterize" Kohler's argument regarding the DNR's review of a permit application under WIS. STAT. § 281.36.  Kohler clarifies that it is *not* arguing that the DNR "can consider only direct impacts caused by wetland fill. The [DNR] must, of course, consider potential secondary and cumulative impacts 'to [WFVs]' stemming from a project." Kohler contends "that the [DNR's] authority to consider such impacts is expressly limited to impacts that bear on '[WFVs].'"  According to Kohler, the ALJ "improperly considered the environmental consequences of unregulated actions throughout the 247-acre site, no matter their proximity to or impact on the 3.69 acres of wetlands to be filled."  Based on Kohler's clarifications, we interpret Kohler's argument as outlined in the body of this opinion.

¶36 We begin with the text of WIS. STAT. § 281.36(3n)(c)3., which expressly requires the DNR to consider "[t]he proposed project" in assessing significant adverse impacts to WFVs, water quality, and other environmental consequences. Neither "water quality" nor "environmental consequences" are defined by statute. However, § 281.36(3n)(b) identifies the factors the DNR must consider when assessing impacts to WFVs. Specifically, the statute expressly requires the DNR to consider, among other things, the "direct impacts to" WFVs, "cumulative impacts" to WFVs, "secondary impacts" to WFVs, *and* "net positive or negative environmental impact of the proposed project." Sec. 281.36(3n)(b).

¶37 Both parties agree that direct impacts are those resulting from direct wetland fill. The ALJ defined secondary impacts as "[i]mpacts that are not the result of fill but result from how the land is used," which closely matched testimony at the contested hearing that defined secondary impacts as "impacts which are closely linked or causally related to the activity but may occur over a longer period of time." *See also* ***Meteor Timber***, 400 Wis. 2d 451, ¶41 (secondary impacts identified in permit as those related to hydrology, presence of invasive species, and wildlife habitat); ***Kalal***, 271 Wis. 2d 633, ¶46 ("[T]echnical or specially-defined words or phrases are given their technical or special definitional meaning."). For example, the DNR concluded in the permit at issue that secondary impacts to WFVs included "[p]ermanent alteration to wetland hydrology (change in grade and removal of trees); decrease in habitat from increased invasive species, … potential disruption of wildlife use (breeding, nesting)," and "routine traffic along the proposed new greens." WISCONSIN ADMIN. CODE § NR 103.03(1), gives a list of WFVs that shall be considered, including "[h]abitat for resident and transient wildlife species" and "[r]ecreational, cultural, educational, scientific and natural scenic beauty values and uses."

¶38 It is clear that WIS. STAT. § 281.36 distinguishes between impacts resulting from the regulated conduct (i.e., the direct discharge into the wetlands) and impacts resulting from the proposed project (i.e., other impacts beyond direct discharge). *See* Paul G. Kent & Jordan K. Lamb, *Wisconsin's Wetland Reform Act*, WIS. LAW., Feb. 1, 2013 (stating that prior to 2011 Wisconsin Act 118, "there was tension between looking exclusively at the immediate wetland impact and looking at both the immediate impact and overall environmental impacts. The Act provides some additional flexibility in this area"). Section 281.36(3n)(c)3. does not state that the DNR may issue a permit only once it determines that the "discharge" "will not result in significant adverse impact to [WFVs], in significant adverse impact to water quality, or in other significant adverse environmental consequences" *to only the wetlands themselves*. *See* § 281.36(3n)(c)3. Nor does § 281.36(3n)(b) provide that in evaluating the impacts to WFVs, the DNR must consider only the "secondary impacts" of the discharge. *See* § 281.36(3n)(b). Rather, § 281.36(3n)(c)3. requires the DNR to consider whether the "proposed project" will result in "significant adverse impact to [WFVs], in significant adverse impact to water quality, or in other significant adverse environmental consequences." *See* § 281.36(3n)(c)3. This review, in turn, requires the DNR to evaluate, for example, "secondary impacts of the proposed project" to WFVs and the "net positive or negative environmental impact of the proposed project." *See* § 281.36(3n)(b)3., 5.

¶39 Indeed, the legislature chose to use the word "discharge" and "wetland fill" in other areas of WIS. STAT. § 281.36, but it did not do so in § 281.36(3n)(b) or (c) when instructing the DNR on how to evaluate a wetland individual permit. *See, e.g.*, § 281.36(3g)(d) ("In issuing wetland general permits under this subsection, the [DNR] shall establish requirements, conditions, and exceptions *to ensure that the*

*discharges will cause only minimal adverse environmental effects ….*" (emphasis added)).[17]

¶40     If adopted, Kohler's interpretation would create superfluous language in the statute. *See Kalal*, 271 Wis. 2d 633, ¶46 ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage."). It is undisputed that the direct impacts to WFVs on the property are those that stem from the proposed discharge of material into the 3.69 acres of wetlands. *See Meteor Timber*, 400 Wis. 2d 451, ¶40. Under Kohler's interpretation, the DNR's analysis would essentially end at the consideration of direct impacts to WFVs (e.g., the direct discharge of material into wetlands). All of the other considerations dictated by WIS. STAT. § 281.36 would be meaningless because after the direct impacts take place (i.e., the wetlands are filled with material), there would be no wetlands to be impacted and nothing left for the DNR to consider. For example, there would be no point in the DNR considering impacts to water quality because the only "water"

---

[17] Kohler contends that WIS. STAT. § 281.36(3n)(c)3.'s reference to "other significant adverse environmental consequences" "is no basis to deny wetland permits due to activities unrelated to wetlands." Citing a DNR guidance document, Kohler states that "other adverse environmental consequences" means that "'where the only practicable alternatives that would avoid or minimize wetland impacts would cause other significant environmental harm'—such as 'impact[ing] the last remaining upland habitat for an endangered species'—the [DNR] 'may have to balance those impacts *and allow the wetland to be developed*.'" (First alteration in original.) A closer look at that document, however, demonstrates that "other adverse environmental consequences" apply to analyses beyond wetlands. Specifically, the document states that "[t]his sub-standard requires that the [DNR] look at issues other than wetland issues."

That said, we are unpersuaded by Kohler's reliance on the document. To begin, the document lacks a publication date or author. It is possible the DNR's interpretation of the statutory text has changed over time. Second, while the parties agreed prehearing to admit the document, there was no testimony during the contested hearing regarding the document. Therefore, the information gaps described above remain. Lastly, we are not bound by guidance documents. "They are not law, they do not have the force or effect of law, and they provide no authority for implementing or enforcing standards or conditions." *Service Emps. Int'l Union, Loc. 1 v. Vos*, 2020 WI 67, ¶102, 393 Wis. 2d 38, 946 N.W.2d 35. They are nonbinding documents produced by the executive branch and are "nothing more than the knowledge and intentions of their authors." *Id.* As always, our focus is on the text of the statute when interpreting statutory language.

subject to consideration would be the water in the wetlands being filled with material. Because the wetlands would be filled, there would be no water quality to consider. Similarly, there would be no point in the DNR considering secondary impacts to WFVs because there would be no WFVs to consider. Because the wetland would be filled, there would be no hydrology to consider. Kohler fails to explain what the statute's purpose of including other impacts would be if the DNR was not required to consider impacts beyond the direct discharge.

¶41    Kohler argues that the ALJ's considerations in this case are "ordinarily beyond the [DNR]'s regulatory authority under the wetlands statute." For example, Kohler contends that it would have been able to remove trees or "certain rare plants" without DNR approval if it had not sought the permit in this case. Kohler notes that Patricia Trochlell—a former DNR staff wetland ecologist who worked on this particular permit application while employed with the agency— testified that if "not for the application to [fill] 3.69 acres of wetlands, there would be nothing to restrict [Kohler] from clear cutting this property[.]" The DNR largely concedes this point, stating that "[t]here is no dispute that some of these activities, *if undertaken alone*, would not require a separate permit."

¶42    Kohler's argument that "[t]he [l]egislature did not grant the [DNR] boundless authority to regulate any aspect of a 'project'" misses the mark.[18]  As discussed above, WIS. STAT. § 281.36(3n)(b) and (c) require the DNR to consider the entire project, including its secondary impacts on WFVs, its impacts on water quality, and any significantly adverse environmental consequences.  Therefore, even assuming, without deciding, that there is no regulation attached to, for example, tree clearing in absence of a wetland individual permit application, Kohler *did* apply for a wetland individual permit and therefore availed itself to the permit application statutory process and administrative code.  The permit system created by the legislature permits the DNR to regulate construction and maintenance of the entire project.

¶43    Kohler also argues that an interpretation allowing the DNR to review an entire project, including "unregulated" activities, would yield absurd results.  Particularly, Kohler states that this "interpretation would have the perverse effect of

_____

[18]  We are similarly unpersuaded by Kohler's reliance on certain language from the permit statutory scheme to argue that WIS. STAT. § 281.36 limits the DNR's review to solely water-related activities.  In making its argument, Kohler cites a number of provisions, including the legislative purpose stated in WIS. STAT. § 281.11, which in relevant part provides that the DNR "shall serve as the central unit of state government to protect, maintain and improve the quality and management *of the waters of the state*."  (Emphasis added.)  Similarly, Kohler cites WIS. ADMIN. CODE § NR 103.03(1)'s language that "water quality related functional values or uses of wetlands[] within the range of natural variation of the affected wetland[] shall be protected" to argue, again, that the DNR is limited to "water quality" considerations.  As argued by Kohler, while WIS. STAT. ch. 281 makes several references to "water" and "wetlands," § 281.36 "does not mention grading or deforestation."

But WIS. STAT. § 281.36 is clear and unambiguous in its directive for the DNR.  Simply because the statute does not refer to every type of possible impact does not mean we can ignore its clear meaning.  In fact, we are "not at liberty to disregard the plain, clear words of the statute," *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted), and we decline Kohler's invitation to do so here.  Furthermore, WIS. ADMIN. CODE § NR 103.03(1) explicitly directs the DNR to protect "water quality related functional values *or uses of wetlands*" of "*the affected* wetland."  (Emphasis added.)  It does not limit the DNR's considerations to directly filled wetlands because other wetlands on a project site can constitute "affected wetland[s]."

25

incentivizing applicants to clear trees, destroy plants, and the like *before* applying for a wetland fill permit, rather than subjecting those otherwise-unregulated activities to the [DNR's] scrutiny."

¶44    Assuming but without deciding that Kohler's cited unregulated activities are indeed unregulated, we conclude that the above interpretation does not produce absurd results. "It is a well-settled proposition that statutory language be read in context and in a reasonable manner so as 'to avoid absurd or unreasonable results.'" *State v. Matthews*, 2019 WI App 44, ¶17, 388 Wis. 2d 335, 933 N.W.2d 152 (citing *Kalal*, 271 Wis. 2d 633, ¶46).

> When the statutory language is clear and straightforward, a court would normally apply the plain meaning to the specific set of facts in the case. However, if that application leads to results that are absurd or unthinkable, then courts should "look beyond the plain meaning" to avoid the absurd results.

*Id.*, ¶17 (citation omitted). The standard for departing from clear statutory language is high, "as it entails departing from the literal language of the statute." *Id.* It is not enough that an interpretation produces a "foolish" outcome. *Id.* (citation omitted). "Instead, a court so finding must be convinced that the result is so absurd that [the legislature], not the court, could not have intended such a result." *Id.* (alteration in original; citation omitted). Put differently, "it must be 'unthinkable' for the legislature 'to have intended the result commanded by the words of the statute.'" *Id.* (citation omitted).

¶45    Our interpretation does not produce an absurd result in any sense. While Kohler may find the result "foolish," the interpretation does not produce a result that the legislature could not have intended. *See id.* To the contrary, and as described in detail above, the legislature clearly intended for the DNR to consider impacts from a proposed project beyond direct wetland discharge. The notion that

upon someone applying to fill wetlands, otherwise unregulated environmental activities are taken under consideration is a reasonable system. "We defer to the legislature on policy, and 'judicial deference to the policy choices enacted into law by the legislature requires that statutory interpretation focus primarily on the language of the statute.'" *Id.*, ¶22 (citation omitted).

¶46 In all, nothing in the permit statutory system limits the DNR from considering impacts only as they relate to the wetlands proposed to be filled. In fact, WIS. STAT. § 281.36(3n)(b) and (c) require the DNR to consider impacts beyond proposed wetland discharge.

### III. The ALJ's finding that the DNR did not have enough information at the time it issued the permit is supported by substantial evidence, and its decision did not "depend[]" on its finding that significant cumulative impacts to WFVs would occur.

¶47 Kohler contends that the ALJ erroneously found that the DNR did not have sufficient evidence to support its finding that the proposed project would "not result in significant adverse impact to [WFVs], in significant adverse impact to water quality, or in other significant adverse environmental consequences." Specifically, Kohler argues that the ALJ made "two critical findings" not supported by substantial evidence, thereby warranting reversal of the ALJ's decision: First, the ALJ's finding that the project would cause cumulative impacts; and, second, the ALJ's finding that nutrients and pesticides would reach the groundwater and wetlands and cause significant adverse impacts.

¶48 As outlined previously, our review of agency fact finding is limited. We must defer to the agency's factual findings, as long as they are supported by substantial evidence. *See* WIS. STAT. § 227.57(6). Moreover, Kohler must show that the ALJ's ultimate decision "depend[ed]" on the challenged factual findings.

*See id.* "Substantial evidence is less of a burden than preponderance of the evidence in that any reasonable view of the evidence is sufficient." ***Robles v. Thomas Hribar Truck & Equip., Inc.***, 2020 WI App 74, ¶8, 394 Wis. 2d 761, 951 N.W.2d 853 (citation omitted). In other words, we do not examine whether the ALJ's findings are more likely than not correct. *See **State v. Loayza***, 2021 WI 11, ¶40, 395 Wis. 2d 521, 954 N.W.2d 358 (defining the preponderance of evidence standard). Instead, our review is limited to "whether, after considering all the evidence of record, reasonable minds could arrive at the same conclusion" as the ALJ. *See **Hilton***, 293 Wis. 2d 1, ¶16.

A. Cumulative impacts finding under WIS. STAT. § 281.36(3n)(b)2.

¶49 Regarding the cumulative impacts on WFVs, the ALJ adopted the DNR's finding that significant cumulative impacts to WFVs could result from the project. The ALJ noted, however, that "[t]he basis for [the DNR's] conclusion [was] not clear." The ALJ cited the testimony of the DNR's witness, Pamela Biersach—the director of the DNR's Office of Business Services in the Fish, Wildlife and Parks Division—that granting the permit could generate more applications for filling wetlands and have a precedential effect for future applications. The ALJ stated, however, that precedent "is not identified as a component of cumulative impacts." Citing Kohler's permit application, the ALJ noted that Kohler does not plan on "additional development beyond the current proposed plan" and, "therefore, no future wetland impacts in the affected area are expected to be caused by the permitting of this [p]roject."

¶50 Even if we agreed with Kohler that the ALJ's finding regarding cumulative impacts to WFVs is not supported by substantial evidence, we conclude, for two reasons, that the ALJ's overall decision did not "depend[]" on the cumulative impacts finding. First, the cumulative impacts analysis consisted of a

28

single paragraph, separate from a much more in-depth and lengthy analysis of missing information regarding secondary impacts.

¶51 Second, and relatedly, cumulative impacts did not have any bearing on the ALJ's decision. The ALJ was not ruling on the merits of the permit and whether the statutory requirements of WIS. STAT. § 281.36(3n)(c)3. were met.[19] Nor did the ALJ rule on, or find, that the DNR lacked information regarding cumulative impacts. Instead, the ALJ ultimately concluded that the FBRF "carried [its] burden of proof to show that the [DNR] did not have sufficient evidence to support its determination that the project will not result in significant adverse impact to [WFVs], in significant adverse impact to water quality, or in other significant adverse environmental consequences" at the time the DNR decided to issue the permit.

B. Significant adverse impacts to WFVs under WIS. STAT. § 281.36(3n)(c)3.

¶52 Next, we address Kohler's argument that "the ALJ's ruling must be overturned because there is no evidence that nutrients and pesticides applied to the golf course would reach the groundwater and wetlands such that significant adverse impacts will result." In support, Kohler asserts that the ALJ "found that the 'application of nutrients to the golf course at allowed levels will result in the mitigation of nitrogen and phosphorous into the groundwater'"; that "rain events and irrigation 'will carry the nutrients, pesticides, and other contaminants applied to the golf course in the groundwater'"; and that "'two to twelve percent of nitrogen

_____

[19] Kohler responds to this conclusion by arguing that the ALJ would not have made findings that "had no purpose" to its decision. Kohler does not, however, explain how or why cumulative impacts applied to the ALJ's ultimate decision regarding the DNR's lack of information and, in fact, admits that "[t]he ALJ's overarching holding was that the [DNR] 'did not have sufficient information to determine the proposed project will not result in significant adverse impact.'" We consider Kohler's argument undeveloped on this issue. *See* **State v. Pettit**, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

applied to the course will leach below the root zone' of the turf." According to Kohler, the ALJ failed to cite any "evidence that pesticides and nutrients will reach the groundwater and wetlands in quantities significant enough to have any impact at all."

¶53 Kohler misunderstands both the ALJ's ruling and the issue on appeal with respect to our substantial evidence analysis. The ALJ's decision did not "depend[]" on its findings of facts regarding the merits of the permit. Rather, the ALJ concluded that the DNR did not have sufficient evidence to support its determination that the project would not result in significant adverse impacts to WFVs at the time it decided to issue the permit. The ALJ did not conclude that the project *will* result in significant adverse impacts to WFVs, as Kohler contends. None of the three findings cited above by Kohler relate to the ALJ's ultimate conclusion.

¶54 In addition, the ALJ's finding that the DNR lacked evidence with respect to its findings regarding nutrients and pesticides is supported by substantial evidence. According to the ALJ, "[i]t is undisputed that the introduction of nitrates, phosphorus, pesticides, oil, grease, and other contaminants in the groundwater and wetlands will adversely impact [WFVs] and the water quality" on the property. Thus, the ALJ reasoned, and we agree, that "the critical question" in evaluating whether the operation of the golf course would result in significant adverse impacts was "the levels of the chemicals and contaminants that [would] reach the groundwater and wetlands" as well as the direction of the groundwater flow and the separation between the surface and groundwater.

¶55 The DNR sought to address these questions during the permit application process by requesting a water table map from Kohler, as well as

stormwater, nutrient, and pesticide management plans.  Importantly, however, the ALJ determined that "[a]t the time the [DNR] issued the permit, [it] had not received the final versions of the various management plans or a reliable water table map." For example, Dr. Stuart Z. Cohen—the president of an "environmental and agronomic service company"—testified at the contested hearing on behalf of Kohler that a detailed IGCMP had yet to be finalized.[20]

¶56     While Kohler did supply a water table map on November 6, 2017, it was not "until very late in the application process."  Additionally, testimony at the hearing revealed that the map "may not be accurate" because, according to Jeff Quast—the president of Excel Engineering who was hired by Kohler to provide civil engineering services on the proposed project—the measurement information from test pits and monitoring wells used to generate the map was not submitted to the DNR.  Furthermore, Quast testified that a cross-section groundwater map of the property was incorrect, and Quast admitted that some groundwater elevations submitted in the stormwater management plan were also incorrect.

¶57     The ALJ also criticized the permit for not providing mandatory conditions to limit the risk of the impacts from pesticides and nutrients.  While the permit requires Kohler to use various BMPs in the operation of the course (e.g., "spoon feeding" chemicals), Dr. Cohen described the BMPs as "a set of concepts." For example, the permit allows Kohler to apply nitrogen at levels of eight pounds per 1,000 square feet for ongoing turf maintenance.  Cohen testified that he expects Kohler to apply nitrogen at a much lower level, and he therefore did not conduct an analysis of whether application of nitrogen at the permitted level would adversely

---

[20] An IGCMP was submitted to the DNR in the fall of 2017.  According to Dr. Cohen, the IGCMP submitted to the DNR was a set of "basic concepts."

impact the groundwater or wetlands. According to the ALJ, the lower nitrogen levels considered by Cohen were "speculative and not a permit condition. The [DNR] must consider the impacts based on what Kohler is allowed to do, not on a best case scenario."

¶58 Similarly, the ALJ discredited testimony from the hearing that the thatch and turf will capture the nutrients applied to the course. Doctor Cohen testified that the only way water carrying nutrients and other chemicals could reach the groundwater was if someone used a posthole digger to bypass the turf. The ALJ concluded, however, that this statement was contrary to Cohen's other testimony that "two to twelve percent of the nitrogen applied to the course will leach below the root zone." The ALJ also expressed skepticism regarding the thatch and turf's capturing of nutrients because "at least three of the [BMPs] in the IGCMP are intended to improve water infiltration by bypassing the turf. These practices are aerification, topdressing, and verticutting."

¶59 Even accepting that the thatch and turf would effectively capture nutrients applied to the course, the ALJ stated that "there [would] be no filter until the turf and thatch [were] established." During the period of turf and thatch establishment, the permit allows higher applications of nitrogen and phosphorus because the sandy soils on the property are nutrient poor. As such, citing the testimony of Dr. Carpenter, the ALJ concluded that "[a] larger portion of the applied nutrients, particularly phosphorus, [would] leach through the permeable soil into the groundwater during the period when the turf [was] becoming established."

¶60 Regarding pesticide usage on the property, the ALJ cited the final EIS, stating that "monitoring groundwater quality for pesticide contamination and minimizing pesticide use through implementation of an [Integrated Pest

Management] plan are potential ways to reduce the potential negative effects of pesticide use." (Formatting in original.) Yet, the ALJ reasoned that the permit "includes no condition requiring groundwater monitoring." The ALJ disregarded Dr. Cohen's additional pesticide evaluation, determining it was irrelevant because it was dated May 18, 2018—four months after the permit was issued and only two weeks before the administrative review hearing.

¶61 While the ALJ's findings can be countered by other evidence in the record, the record supports the ALJ's finding that the DNR did not have sufficient evidence to support its determination that the nutrients and pesticides applied as part of the project would not result in significant adverse impacts to WFVs. *See Hilton*, 293 Wis. 2d 1, ¶16. We will not second-guess the ALJ's ultimate decision because it is supported by substantial evidence.

¶62 Kohler specifically takes issue with the ALJ's finding that *any* amount "of nitrogen or other contaminants entering the leachate" will have a significant adverse impact to WFVs. Kohler points to Dr. Cohen's testimony that small amounts of these chemicals will have no impact. According to Kohler, it presented "substantial evidence … to show that any impact on wetlands [would] be insignificant."

¶63 We first note that we are not considering whether Kohler presented "substantial evidence." Instead, we are tasked with determining whether the ALJ's finding regarding the DNR's lack of information with respect to chemicals entering the groundwater is supported by substantial evidence. We conclude that it is.

¶64 The permit itself stated that "4.79 acres of secondary impacts may result from … increased runoff of nutrients, herbicides, and pesticides" and that

"nutrient loading" was a secondary impact to WFVs. Additionally, the final EIS stated:

> The Kohler [p]roperty has predominantly sandy soils with high infiltration rates and high hydraulic conductivity. This combined with a shallow depth to the surficial groundwater aquifer increases the potential for pesticides and fertilizer to leach into the shallow aquifer which may additionally reach the Black River, Lake Michigan, and the associated wetlands.

The final EIS also noted that "irrigation water and fertilizer run-off into the … wetlands would impact water quality by increasing nutrients and leading to changes in the plant assemblages." Notably, the DNR did not specify a certain amount of chemicals that the wetlands would tolerate. Instead, it stated that "[i]t is unknown to what extent stormwater infiltration and nutrient and pesticide applications to fairways, tees and greens (for either establishment or maintenance) would impact groundwater quality in this permeable soil and shallow water table environment." Trochlell testified at the contested hearing that "any nutrient additions to these very sensitive wetlands will have an impact upon them."

¶65 While Dr. Cohen may have disagreed with that finding, the ALJ was not obligated to follow Cohen's lead and find that small amounts of chemicals would be harmless. Instead, the ALJ determined that the DNR was required to have more information before it could resolve: (1) whether chemicals would reach the wetlands through the soil; and (2) if so, whether those amounts would be harmful. Without this information, the ALJ found the DNR could not have meaningfully analyzed the secondary impacts to WFVs.

¶66 Kohler also argues that the permit conditions for BMPs would "undisputedly have a major effect on limiting nutrient and pesticide penetration into

groundwater."[21] In support, Kohler cites to a number of statements made by the FBRF witnesses, such as Dr. Jansen, who stated, "I agree that slow release fertilizers generally will reduce the risk of contamination."[22] Kohler also cites to "empirical work" in the record.

¶67 Contrary to Kohler's assertion, the effectiveness of the permit conditions for BMPs was significantly disputed at the contested hearing. For example, Dr. Jansen testified regarding condition 22—requiring Kohler to follow BMPs—and stated he had not "seen any evaluation by the DNR … that connects complying with these BMPs to compliance with water quality standards." Doctor Carpenter also stated in his prefiled testimony that condition 22 "seems to be quite generic and contains no evidence that what is applied to the golf course will not end up in the wetlands." Similarly, Trochlell stated in her prefiled testimony that condition 23—requiring Kohler to follow WIS. ADMIN. CODE ch. NR 151—is not sufficient to protect wetland water quality because "this rule was not designed to ensure [WFVs] are protected in all cases, and certainly not in this sensitive

---

[21] Kohler also contends that the BMPs requiring "spoon feeding" will prevent chemicals from reaching the groundwater, and, therefore, the DNR did not need any further information. According to Kohler, "[o]ne cannot both 'spoon feed' fertilizer and dramatically over-apply fertilizer at the same time." Kohler does not cite to the record or any other authority to support its assertion. Additionally, Dr. Jansen testified that "spoon feeding" as used in the BMPs is subjective: "[T]hat's how [Kohler] described it, but they're talking about a pound per 1,000 square feet. We have references that show that that rate can lead to 3.8 parts per million … in the lysimeters."

[22] As has been the case throughout Kohler's briefing, Kohler's citations here to the FBRF's witnesses' testimony are either taken out of context or are completely misleading. One example is Kohler's citation to Dr. Jansen's testimony. Kohler claims that Jansen agreed that, in Kohler's words, "turf [is] effective at absorbing nutrients and pesticides." To the contrary, Jansen actually said, "I'll agree that turf does a better job of absorbing nutrients and pesticides than some other things like row crops. But it is not an excellent system for removing nitrogen and pesticides. It can easily be bypassed."

environment." Additionally, Dr. Cohen described the BMPs as a set of concepts, not mandatory conditions. The testimony above comports with the IGCMP. For example, one BMP states that Kohler will "[u]se slow release or organic fertilizers with 50% or less soluble Nitrogen *when possible*." (Emphasis added.) As such, the ALJ's determination regarding the permit conditions for BMPs is supported by substantial evidence.[23]

¶68     Regarding the ALJ's findings on phosphorus, Kohler argues that "even [the FBRF's] own witnesses confirmed that phosphorous will not pose a problem." This assertion completely ignores Dr. Carpenter's testimony that phosphorous is "always … a potential problem mix. It's a more powerful agent generally in change than even nitrogen because it acts at lower levels." Carpenter went on to state that phosphorous will need to be applied at a higher rate initially in order to establish the golf course grasses. According to Carpenter, "because you can't apply [phosphorous] by the dropper at the root, you're going to have granules of phosphate material hitting empty, sandy patches" and eventually dissolving into water. Carpenter also stated he did not believe phosphorous would be an easily managed problem on the proposed golf course. Therefore, the ALJ's finding that the DNR did not have sufficient evidence to support its determination pursuant to WIS. STAT. § 281.36(3n)3. at the time it decided to issue the permit is supported by substantial evidence.

¶69     Next, Kohler contends that the ALJ's finding regarding nitrogen is not supported by substantial evidence because Kohler "expressly committed to applying far less than eight pounds of nitrogen per one thousand square feet." Doctor Cohen

---

[23] Kohler cites "its longstanding focus on environmental preservation" and its "minimalist approach to pesticides and fertilization." Kohler does not explain how this history affects the ALJ's findings, and we will not consider it further. *See Pettit*, 171 Wis. 2d at 646.

testified at the contested hearing that Kohler will use less than that amount based on "35 years of experience and talking to the superintendents of the Kohler golf courses." According to Cohen, Kohler will apply "[l]ess than 3 pounds per 1,000 square feet over the managed turf."

¶70 We disagree that the testimony of a witness—who does not work for Kohler—is an "express[] commit[ment]" on behalf of Kohler. In any event, the ALJ concluded that Dr. Cohen's testimony about nitrogen levels was "speculative and not a permit condition." Kohler does not explain how this finding is not supported by substantial evidence.

¶71 Kohler also argues that it "presented undisputed evidence about how its irrigation systems further defend against groundwater contamination." According to Kohler, the only opposition to Kohler's irrigation system related to quickly changing weather and how a computerized irrigation system will not be able to adapt in such situations. We disagree that this affects our conclusion. While there was testimony supporting Kohler's claim, there was also evidence disputing the irrigation system's effectiveness.

¶72 In all, Kohler provides no basis for us to conclude that the ALJ's finding that the DNR lacked sufficient information to meaningfully analyze the proposed project pursuant to WIS. STAT. § 281.36(3n)3. is not supported by substantial evidence. In other words, "after considering all the evidence of record, reasonable minds could arrive at the same conclusion" as the ALJ did in this case. *See Hilton*, 293 Wis. 2d 1, ¶16.

¶73 Kohler attempts to refute the above evidence by arguing that the ALJ declined to consider evidence that Kohler argues would have met the requirements of WIS. STAT. § 281.36(3n)(c). In other words, Kohler argues that although the ALJ

determined that the DNR lacked sufficient information to issue the permit, the ALJ should have considered additional evidence that Kohler submitted during the contested hearing.

¶74    According to Kohler, the ALJ identified three areas of information that the DNR lacked at the time it issued the permit: (1) the levels of nitrogen to be applied to the course; (2) the types of pesticides to be applied to the course, as well as pesticide impacts; and (3) whether Kohler planned on using groundwater monitoring to avoid potential pesticide impact.[24]

¶75    Kohler states that it "definitively" provided sufficient information at the contested hearing for the ALJ to determine all three of these issues.  For example, Kohler cites the IGCMP and the pesticide risk assessment that were introduced at the contested hearing.  Citing the fact that contested hearings are akin to trials, Kohler argues that "[t]he ALJ erred as a matter of law in ignoring this evidence merely because it was developed as part of the contested[]case hearing. This rule flatly misapplies the very nature of contested[]case proceedings, the purpose of which is to adjudicate disputed facts in a trial-like manner."  In making these arguments, Kohler posits that the ALJ "repeatedly considered new evidence presented by the [FBRF] during the contested[]case hearing" but ignored the additional evidence presented by Kohler.

---

[24] Although not necessary to our decision on this issue, we note that the ALJ also found other pieces of information lacking from the permit process, including that the DNR lacked a reliable water table map.  Additionally, the DNR and the FBRF argue that Kohler's submitted evidence did not resolve the deficiencies in the information the ALJ noted.  Because we decide this issue on narrower grounds, we need not address whether Kohler's supplemental information provided the DNR with sufficient information to make a decision under WIS. STAT. § 281.36. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707.

¶76    Kohler ignores the fact that all three issues the ALJ identified related to whether the DNR had sufficient information to issue a permit *at the time the decision was made*. The evidence submitted by the DNR and Kohler at the contested hearing attempted to fill the information gaps that the DNR did not have at the time the permit was issued. Put differently, the DNR and Kohler were attempting to retroactively fix errors in the permit process.

¶77    For example, Kohler submitted Exhibit 208, titled "Ground Water Contamination Risk Assessment Screen for Pesticides at the Proposed Kohler Golf Course in Sheboygan." Doctor Cohen testified that he prepared the report, that he performed the risk assessment "[a] few weeks" before the contested hearing, that its purpose was essentially to confirm that Kohler "would comply with condition 22 of the permit," and that the DNR did not have the exhibit before it when it made the permit decision. By submitting exhibits prepared after the permit was granted, Kohler tacitly acknowledged that the DNR was missing information at the time it issued the permit.

¶78    Conversely, the evidence submitted by the FBRF of which Kohler complains was presented in order to display the deficiencies in the DNR's decision based on information the DNR did not have at the time it issued the permit. For example, the FBRF submitted a number of exhibits regarding internal DNR communications about Kohler's permit application. Exhibits 9, 25, and 26, for example, were internal DNR emails from staff members concerning missing information that the DNR was requesting from Kohler but, according to the FBRF, was never received. As such, the ALJ's factual findings are supported by substantial evidence.

**IV. The ALJ did not err in reversing the DNR's decision instead of modifying the permit sua sponte.**

¶79    Kohler also contends that the ALJ erred by not modifying the permit's conditions to account for what the ALJ perceived as deficiencies. According to Kohler, the ALJ violated WIS. STAT. § 281.36(3n)(c) by not modifying the permit sua sponte after concluding that the permit lacked sufficient conditions.[25]  Kohler argues that the ALJ "had the power" and "the obligation" to modify the permit. Specifically, Kohler reasons that the ALJ was required to make findings "that may be adopted as the final decision in the case." *See* WIS. STAT. § 227.46(2).  This requirement is particularly crucial, says Kohler, because the DNR did not petition for judicial review and therefore adopted the ALJ's decision as its own.  In other words, Kohler states that the ALJ "stood in the shoes of the [DNR]" as the final decision maker.

¶80    We conclude the ALJ did not possess the authority to modify the permit conditions sua sponte.  WISCONSIN STAT. § 281.36(3q)(g) states that an administrative hearing on a challenge to a DNR wetland permit "shall be treated as a contested case under [WIS. STAT.] ch. 227."  Prior to the hearing, a notice shall be sent out defining the issues to be decided.  *See* WIS. STAT. § 227.44(2)(c). We have previously held that a failure to provide notice for a contested hearing under § 227.44(2)(c) of *all* of the issues involved can constitute a deprivation of a party's due process rights. *See **Bracegirdle v. DRL***, 159 Wis. 2d 402, 411-12, 419-20, 464

---

[25] Kohler contends in its brief-in-chief that "[t]he ALJ expressly acknowledged that '[t]he permit could be amended' … 'either by stipulation or order.'"  The ALJ's statement, as cited by Kohler, is taken out of context.  The statement was made in response to an objection the FBRF made regarding an updated IGCMP which Kohler was using in an attempt to elicit witness testimony.  The FBRF noted that the IGCMP in question was not the same IGCMP cited in the permit.  In response, the ALJ inquired of Kohler whether "at some point is this, I guess, the upgraded or updated plan that would be in place if the permit was approved?"  Kohler answered in the affirmative, and the ALJ stated that—in the context of whether the permit was approved after the contested hearing—"[t]he permit could be amended.  The condition could be amended either by stipulation or order."

N.W.2d 111 (Ct. App. 1990) (board violated nurse's right to fair notice and opportunity to be heard when it found that she violated conduct not charged).

¶81    Here, the parties limited the issues to: (1) whether the permit satisfied the standard set forth in WIS. STAT. § 281.36(3n)(c)3.; and (2) whether the DNR had sufficient information to make a decision under that standard. Missing from this list is whether the ALJ could, or should, amend the conditions if it found them lacking in scope. The ALJ therefore did not possess the authority to raise an issue sua sponte without it first being presented as an issue under WIS. STAT. § 227.44(2)(c).

¶82    Kohler relies on *Clean Wisconsin, Inc. v. DNR*, 2021 WI 71, 398 Wis. 2d 386, 961 N.W.2d 346, to argue that the ALJ "ignored his statutory obligation" by not amending the permit in this case. *Clean Wisconsin* involved the DNR granting a Wisconsin Pollutant Discharge Elimination System (WPDES) permit to a dairy operation applicant. *Id.*, ¶1. Petitioners challenged the permit based on missing conditions. Namely, the permit lacked two conditions related to the "maximum number of animal units" and "monitoring to evaluate impacts to groundwater." *Id.*, ¶4. Following a contested hearing, an "ALJ determined that, based on the facts presented, the DNR had 'clear regulatory authority' to impose the two conditions disputed in this action upon [the dairy operator's] … WPDES permit." *Id.*, ¶7. The ALJ "ordered" the DNR to modify the permit to include the two conditions. *Id.*, ¶¶8-9. On review, our supreme court concluded that the DNR had the authority to impose the two conditions. *See id.*, ¶40.

¶83    We conclude that *Clean Wisconsin* is inapposite to the case at hand because in *Clean Wisconsin* the permit was lawfully issued from its inception. The ALJ in *Clean Wisconsin* did not conclude the permit was unlawfully issued. Conversely, the ALJ in this case found exactly that—i.e., that the DNR did not have

sufficient information to issue the permit. Furthermore, the ALJ in *Clean Wisconsin* merely ordered the DNR to modify the permit; the ALJ did not modify the permit.

¶84     The issue here is better framed as whether the DNR "is authorized to issue an amended permit when there is no valid permit to amend." *See Meteor Timber*, 400 Wis. 2d 451, ¶90. Ultimately, we need not answer that particular question because we conclude that the issue of amending the permit's conditions was not presented to the ALJ under WIS. STAT. § 227.44(2)(c). We also note, however, that like the permit applicant in *Meteor Timber*, Kohler points to no law supporting the proposition that an ALJ is authorized to amend a wetland permit after concluding that it was not lawfully issued and was therefore invalid.[26] "In the absence of any such citation, and in light of our conclusion that the [DNR's] decision to issue the permit was properly reversed, we conclude that the" ALJ did not err by not revising the DNR's permit after concluding that the agency improperly issued the permit in the first place.[27] *See Meteor Timber*, 400 Wis. 2d 451, ¶90.

---

[26] Notably, Kohler does not raise an argument on appeal regarding WIS. ADMIN. CODE § NR 2.14(2), which states that "[e]vidence submitted at the time of hearing need not be limited to matters set forth in pleadings, petitions or applications. If variances of this nature occur, then the pleadings, petitions or applications shall be considered amended by the record." We therefore will not consider the relevance of § NR 2.14(2) further.

[27] Following the issuance of our decision in *Meteor Timber*, the FBRF filed a citation of supplemental authority, and Kohler responded. Kohler attempts to distinguish *Meteor Timber* by arguing that unlike in *Meteor Timber*, here "the [DNR] determined that Kohler's application was complete and issued the permit in compliance with [WIS. STAT.] § 281.36(3m)(i); it did not purport to issue a permit that by its own terms required the submission of additional information necessary for the [DNR] to make the prerequisite determinations for permit issuance." We disagree. In both *Meteor Timber* and this case, the DNR unlawfully issued a permit. Therefore, as we held in *Meteor Timber*, the question becomes whether the ALJ can amend an invalid permit. The DNR's subjective reasoning does not guide our analysis.

¶85    Even if we concluded that the ALJ could have amended the permit and erred in failing to do so, Kohler forfeited this argument by not raising it before the ALJ.  *See DOJ v. DWD*, 2015 WI App 22, ¶18, 361 Wis. 2d 196, 861 N.W.2d 789 ("Because our review of an administrative agency's decision contemplates review of the record developed before the agency, a party's failure to properly raise an issue before the administrative agency generally forfeits the right to raise that issue before a reviewing court."); *see also Amazon Logistics, Inc. v. LIRC*, 2023 WI App 26, ¶72, 407 Wis. 2d 807, 992 N.W.2d 168.

¶86    Without citation, Kohler argues it could not have forfeited the amendment issue during the administrative proceedings because it was not the petitioner.  Although unclear, it appears Kohler is relying on case law that states a respondent on appeal may raise any argument that would support the circuit court's action, even if the argument was not previously raised in the circuit court.  *See State v. Holt*, 128 Wis. 2d 110, 124-25, 382 N.W.2d 679 (Ct. App. 1985), *superseded by statute on other grounds*, WIS. STAT. § 940.225(7).  Here, Kohler is not the respondent on appeal, and we are reviewing an ALJ decision.  Kohler's argument that we should not apply the forfeiture doctrine under the circumstances of this case is undeveloped and unsupported by legal authority.  We will not develop an argument on its behalf.  *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

## V.  The ALJ did not err in making a single reference to "quantitative findings."

¶87    Lastly, Kohler focuses on a single sentence in the ALJ's decision to argue that the decision is based on a misrepresentation of law because the ALJ, according to Kohler, "required" the DNR to make "quantitative findings as to at what point the secondary adverse impacts would become significant," which is not

a required analysis in the wetland permitting process.[28] Kohler argues that "[a]nalyzing secondary impacts of a future project necessarily involves some level of uncertainty, and certain impacts cannot be quantified at all."

¶88 In full, the ALJ's reference to quantitative findings reads:

> The [DNR] *did not make any quantitative findings* as to at what point the secondary adverse impacts would become significant or explain how the [permit] conditions would reduce the adverse impacts below the level of significance either in the permit itself or through [DNR] staff testimony at the hearing.

(Emphasis added.) According to Kohler, the ALJ's statement is significant as it involved a "key issue in the contested case," and it contends the ALJ concluded "that the [DNR's] decision to grant the permit failed for a lack of quantitative findings." We disagree.

¶89 When considered in the context of the ALJ's entire discussion of secondary impacts, it is clear the ALJ did not "require" Kohler or the DNR to produce a quantitative analysis of secondary impacts. Instead, the ALJ was concerned with the lack of information regarding significant adverse impacts. The remainder of the paragraph cited by Kohler reads:

> The [DNR] may be confident that Kohler's management plans will ultimately be sufficient to protect the wetlands; however the [DNR] should be making its determinations based on completed plans, not trusting that management plans that will be prepared will adequately protect the groundwater and wetlands. Once the golf course is constructed[,] the adverse impacts will be permanent and irreversible. *The [DNR] is required to make a determination*

---

[28] The DNR urges this court not to consider Kohler's argument in this regard because Kohler fails to frame the issue as reviewable error under WIS. STAT. § 227.57. We, conclude, however, that Kohler challenges the ALJ's decision as an incorrect interpretation of law, and we will analyze the merits of that claim. *See* § 227.57(11).

> *that the project will not result in significant adverse impacts. It is unable to do so based on incomplete information.* Kohler contends that the processing of the instant permit was unusually long and thorough. The process has been long, but it was still incomplete at the time the [DNR] closed the application process.

(Emphasis added.) It is clear that the ALJ's single reference to "quantitative findings" was based on a much larger critique of the DNR's lack of information regarding secondary impacts. The ALJ correctly stated that the DNR was "*required*" to make a determination that the project would not result in significant adverse impacts to WFVs.

¶90 In further support of its argument, Kohler cites to other isolated references that the ALJ made regarding "levels" and "amounts" of chemicals. These citations further demonstrate, however, that the ALJ was not requiring Kohler or the DNR to provide specific numerical findings regarding what level of, for example, nitrogen would reach the wetlands. Generally speaking, the ALJ noted that the "critical question [was] the levels of … chemicals and contaminants that [would] reach the groundwater and wetlands." The ALJ did not say that the DNR or Kohler was required to provide the specific numbers that would reach the groundwater or wetlands, but only that the information before the DNR lacked sufficient specificity for the DNR to determine whether whatever level did reach the groundwater would be significant.

¶91 The ALJ expressly stated that the

> [i]mportant pieces of information needed to predict these levels [(i.e., the levels that would cause significant adverse impacts to WFVs) are] the levels at which nutrients will be applied to the course, the identity of the pesticides that will be used by Kohler, the direction of groundwater flow, and the separation between the surface and the groundwater.

Nowhere did the ALJ state that the DNR or Kohler was "required" to make "quantitative findings" as to what chemicals would reach the groundwater or wetlands and in what amounts. Instead, the ALJ's focus was on the lack of information regarding levels applied to the course and the other information noted like the groundwater flow. Without this information, it was impossible for the DNR to know whether the operation of the golf course would result in significant adverse impacts to WFVs.

¶92 As described, the ALJ's reference to quantitative findings was just that—a reference. Despite Kohler's best efforts to characterize the statement as the be-all and end-all finding, the statement did not constitute the reason the ALJ decided the DNR lacked sufficient information on secondary impacts to issue the permit. The statement came after a lengthy discussion of the information regarding pesticides and nutrients to be used on the site that was missing when the DNR issued the permit. For the reasons stated, there was no error of law.

**CONCLUSION**

¶93    In all, we conclude that WIS. STAT. § 281.36(3n)(b) and (c) require the DNR to consider impacts and activities beyond regulated, direct wetland fill. *See also* WIS. ADMIN. CODE § NR 103.03(1).  Additionally, the ALJ's decision is supported by substantial evidence.  Namely, the ALJ's decision that the DNR did not have the information necessary to make a § 281.36(3n)(c)3. determination is supported by substantial evidence—i.e., one that reasonable minds could reach— and the decision did not "depend[]" on cumulative impact findings.  Further, the ALJ did not err in reversing the DNR's decision without modifying the permit.  Lastly, the ALJ did not require Kohler or the DNR to make "quantitative findings" with regard to secondary impacts.

*By the Court.*—Order affirmed.